**Alexander ALONZO, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 10–00–224–CR.**

Court of Appeals of Texas, Waco.

Dec. 19, 2001.

Rehearing Overruled Jan. 16, 2002.

Brian W. Wice, Houston, for appellant.

Charles A. Rosenthal, Harris County District Attorney, Alan Curry, Harris County Assistant District Attorney, Houston, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

BILL VANCE, Justice.

On July 6, 1997, seventeen-year-old Andrew Touring was kidnaped, robbed, shot, and killed. Seven months later Alexander Alonzo and Lance Lacaz were arrested for the murder, a capital offense. TEX. PEN. CODE ANN. § 19.03(a)(2) (Vernon 1994). Although age fifteen at the time, Alonzo was certified to stand trial as an adult and was indicted. TEX. FAM.CODE ANN. § 54.02 (Vernon Supp.2002). The State was prohibited by statute from seeking the death penalty. TEX. PEN.CODE ANN. § 8.07(c) (Vernon Supp.2002). Lacaz, who was also indicted, gave a statement to police implicating himself and Alonzo.[1] The State offered plea bargains to both Alonzo and Lacaz to plead guilty to regular murder with a sentencing recommendation of thirty to thirty-five years. Alonzo refused the offer, but Lacaz accepted it in exchange for his testimony against Alonzo.[2] However, the offer to Lacaz was withdrawn because he communicated with Alonzo, and the State believed his testimony had been "compromised." He did not testify at Alonzo's trial. A jury convicted Alonzo, and he was given an automatic life sentence. On appeal he asserts twenty points of error. We will reverse the judgment and remand the cause for a new trial.

## LEGAL SUFFICIENCY OF THE EVIDENCE

■ Point of error twenty pertains to article 38.14 of the rules of criminal procedure which states:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979). The reason for the rule is that accomplice testimony is inherently untrustworthy and should be viewed with caution. *Blake v. State,* 971 S.W.2d 451, 454 (Tex. Crim.App.1998).

Unindicted alleged accomplices Tara Hatcher and Jimmy Tagameyer testified against Alonzo at trial. The jury was given the "accomplice-witness instruction" that it could not convict Alonzo based on their testimony if it determined (1) Hatcher and Tagameyer were accomplices, and (2) if so, there was no "other evidence in the case, outside of the testimony of Tara Hatcher and/or Jimmy Tagameyer, tending to connect [Alonzo] with the offense charged." Alonzo argues that Hatcher and Tagameyer were accomplices, and that there was no "other evidence." Therefore, a conviction could not be sustained based on their testimony.

### Accomplice Witness Testimony

Alonzo asserts that the "trial court charged the jury that Tara Hatcher and Jimmy Tagameyer were accomplice witnesses."[3] However, the court's charge instructed the jury to determine if Hatcher and Tagameyer were accomplices; it did not instruct the jury that they were accomplices.

---

1. The record indicates Lacaz was an eighth-grade dropout and former special education student with a low IQ. The record also indicates that Alonzo passed a polygraph test.

2. Their cases were severed.

3. Alonzo footnotes this assertion in his brief with: "Hatcher testified that she, Tagameyer, Appellant, and Lacaz were present when Appellant and Lacaz shot and robbed the decedent at the Cliffs. (7 RR at 141–146). Tagameyer's testimony mirrored Hatcher's in all material respects. (8 RR at 75–78)."

■ The accomplice-witness instruction is required whenever trial testimony offered by the State is elicited from an accomplice to the crime for the purpose of proving that the defendant committed the crime. *Selman v. State,* 807 S.W.2d 310, 311 (Tex.Crim.App.1991); *Gamez v. State,* 737 S.W.2d 315, 322 (Tex.Crim.App.1987).[4] If there is a fact question about whether a witness is an accomplice, the jury should be instructed to decide that issue. *DeBlanc v. State,* 799 S.W.2d 701, 708 (Tex. Crim.App.1990).

■ "A person is an accomplice if he participates before, during, or after the commission of the crime and can be prosecuted for the same offense as the defendant or for a lesser-included offense." *Medina v. State,* 7 S.W.3d 633, 641 (Tex. Crim.App.1999), *cert. denied,* 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000) (citing *Blake,* 971 S.W.2d at 454–55 (Tex.Crim.App.1998)). Mere presence at the scene of the offense does not make someone an accomplice. *Blake,* 971 S.W.2d at 454 (citing *Creel v. State,* 754 S.W.2d 205, 213 (Tex.Crim.App.1988)). Some affirmative act or omission is required. *Id.*(citing *McFarland v. State,* 928 S.W.2d 482, 514 (Tex.Crim.App.1996) (there must be an affirmative act which promotes the commission of the offense)). On the other hand, a person can be an accomplice although not present at the scene of the crime. *Id.* (citing *Goodwin v. State,* 165 Tex.Crim. 375, 307 S.W.2d 264 (1957)). But simply knowing about a crime and failing to disclose it, or even concealing it, does not make someone an accomplice. *Id.* (citing *Easter v. State,* 536 S.W.2d 223, 225 (Tex.Crim.App.1976)).

■ Hatcher, age fourteen at the time of the murder, testified that she was Alonzo's former girlfriend. She knew one of Alonzo's closest friends, Lance Lacaz. On the afternoon of the day of the murder, she rode with Alonzo and Lacaz in Alonzo's car to the home of Jimmy Tagameyer whom she then met for the first time. When they arrived, Andrew Touring, the victim, was next door. Hatcher did not know Touring.

Hatcher said Alonzo and Lacaz attempted to buy marihuana from Touring, but he had only LSD. Touring was supposed to meet the four later to make the LSD sale. When he did not show up, they drove around and spotted him walking. Alonzo was driving his car, and Lacaz was in the front seat. Touring was invited into the backseat of the car between Hatcher and Tagameyer. Lacaz pulled out a .45 caliber pistol, which Hatcher had seen before at Alonzo's home, and pointed the pistol at Touring. Lacaz told Hatcher to pat down Touring, which she did "[s]lightly, just to make sure he didn't have any weapons on him." Lacaz demanded the LSD, which Touring handed over. Touring asked Hatcher for a cigarette which she gave him.

Then, according to Hatcher, Alonzo and Lacaz began discussing whether to kill Touring. Alonzo suggested that they go to the Cliffs near a lake. Once at the Cliffs, Touring's black Nike sandals were taken so he couldn't run, and his pager was also

---

4. If "there exists no doubt or the evidence clearly shows that a witness is an accomplice witness as a matter of law," the court should so instruct the jury. When the witness has been indicted for the same offense as the defendant, the witness is an accomplice witness as a matter of law. *DeBlanc v. State,* 799 S.W.2d 701, 708 (Tex.Crim.App.1990). However, it is not necessary that he actually be indicted if the evidence is otherwise clear that he is an accomplice. *Blake v. State,* 971 S.W.2d 451, 455 (Tex.Crim.App.1998). The same principle applies if the person could be indicted, or was, of a lesser-included offense. *Id.* (citing *Ex parte Zepeda,* 819 S.W.2d 874 (Tex.Crim.App.1991)).

taken. Then, all five got out of the car. After they walked a distance, Hatcher and Tagameyer stopped. The other three walked a little farther. Lacaz told Touring to walk ahead with his back to Lacaz. When Touring was a few yards in front, Lacaz shot him. Lacaz approached and shot again. Then Alonzo grabbed Hatcher's wrist and pulled her over to the body, saying "You got to go see this." They noticed Touring was still breathing, so Alonzo took the gun and shot once more.[5] They started to leave, but Lacaz remembered that the shell casings needed to be retrieved. Only one was found, picked up by Alonzo. The four left in the car, and Hatcher asked to be taken home.

Hatcher kept what she knew a secret for about six months; then she told her mother, who contacted police. She remained involved with Alonzo briefly after the murder; she had no further contact with Tagameyer.

Tagameyer, age eighteen at the time of the murder, was a friend of Touring. After Hatcher interviewed with the police, Tagameyer was interviewed and gave a statement. He testified he did not know Lacaz's last name and had met Hatcher once but did not know her name. He gave testimony virtually identical to Hatcher's in all material respects. Facts he added were: (1) Lacaz told him to hit Touring, which he did out of fear because Lacaz had the .45 caliber pistol (Tagameyer elbowed Touring in the chest); (2) Alonzo and Lacaz were laughing after the murder; (3) when Hatcher was taken home, Alonzo and Lacaz threatened to kill Tagameyer and Hatcher if they told anyone.

Assuming that Hatcher or Tagameyer were accomplices as a matter of law or that the jury found that Hatcher and Tagameyer were accomplices, the question is whether there was "other evidence . . . tending to connect" Alonzo with the crime.

### Was There Other Evidence Tending to Connect Alonzo with the Crime?

The jury was presented with ample evidence connecting Alonzo to the crime.

- Tracy Solis, a good friend of Hatcher, testified that about a week after the murder, Alonzo bragged to her about killing Touring and described how the offense was committed.[6]

- The murder weapon was found by police in Alonzo's car.

- Melissa Snead testified that shortly before his death, Touring was supposed to sell LSD to Alonzo and Lacaz. She testified Touring was with Alonzo and Lacaz shortly before his death.

- Lacaz told Paul Makow ten days after the murder that he and Alonzo killed someone for LSD. Makow got the impression the murder had just happened.

- Karen Touring, the victim's mother, testified that he had black and white Nike sandals which he was wearing on the afternoon of July 5, 1997. Her son would often stay with a neighbor and kept personal belongings there. Paul Makow testified Alonzo gave black Nike sandals to him ten days after the murder. He said he later threw the sandals in the bayou.

---

5. Touring was shot once in the back, once in the rear of his jaw, and once near an eye. All three shots were fatal.

6. She said Alonzo told her that he, Lacaz, and Hatcher took Touring to the Cliffs where Lacaz shot him. Lacaz then told Alonzo to shoot Touring. Alonzo laughed as he described to Solis what had happened.

### Conclusion

The record does not support Alonzo's argument that there was insufficient "other evidence" tending to connect him with the crime. Therefore, his "legally insufficient evidence" argument cannot stand. Point of error twenty is overruled.

## MOTION TO SUPPRESS

In points of error one and two, Alonzo claims the trial court erred in denying his motion to suppress the murder weapon and its magazine which were found in his car. A hearing was conducted on the motion before trial.

### Standard of Review

■ A trial court's denial of a motion to suppress is reviewed for abuse of discretion. *Oles v. State,* 993 S.W.2d 103, 106 (Tex.Crim.App.1999). There is an abuse of discretion "when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App.1992); *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990) (op. on reh'g).

■ The trial court's findings of fact are given "almost total deference," and in the absence of explicit findings, the appellate court assumes the trial court made implicit findings which are supported in the record. *Carmouche v. State,* 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000); *see Guzman v. State,* 955 S.W.2d 85, 89–90 (Tex.Crim.App.1997). However, the application of the relevant law to the facts, including Fourth Amendment search and seizure law, is reviewed *de novo. Carmouche,* 10 S.W.3d at 327; *Oles,* 993 S.W.2d at 106. Also, when the facts are undisputed and we are presented with a pure question of law, *de novo* review is proper. *Oles v. State,* 965 S.W.2d 641, 643 (Tex.App.-Houston [1st Dist.] 1998), *aff'd,* 993 S.W.2d 103 (Tex.Crim.App.1999). Thus, for example, when the issue to be determined on appeal is whether an officer had probable cause, "the trial judge is not in an appreciably better position than the reviewing court to make that determination." *Guzman,* 955 S.W.2d at 87. Therefore, although due weight should be given to the inferences drawn by trial judges and law enforcement officers, determinations of matters such as reasonable suspicion and probable cause should be reviewed *de novo* on appeal. *Id.* (citing *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996)).

■ When conducting our analysis, we may consider not only the testimony at the hearing on the motion to suppress, but also the trial testimony. When, as here, the defense participates in the examination of witnesses at trial on issues pertinent to a pre-trial motion to suppress, or does not participate but also does not object to the subject matter of the testimony, the defendant has consensually relitigated the suppression issue. *Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App.1996); *Hardesty v. State,* 667 S.W.2d 130, 133 n. 6 (Tex.Crim.App.1984). Therefore, the trial court's pre-trial ruling is assessed in light of the evidence at both the pre-trial hearing and at trial.

### Facts

Officer Byrd testified at the hearing that ten days after the murder, he saw a car pull away from a curb and into a moving lane of traffic (his lane) without signaling. He stopped the car; it was Alonzo's, and he was driving. Lacaz and Jimmy James were passengers. Byrd recognized Alonzo and Lacaz as members of the Hoover Deuce Cripps gang, and James as a member of the Aryan Brotherhood. Byrd testified that after ticketing Alonzo for traffic violations, he obtained verbal consent from

Alonzo to search the car. He said he felt unsafe because of the gang-affiliation of the occupants. Backup officers arrived, and all three occupants of the car were removed from it. The search was conducted, and the murder weapon, fully loaded, was found under the front passenger's seat in which Lacaz had been sitting. In response to Byrd's query, Lacaz claimed ownership of the weapon, and he was arrested for unlawfully carrying a weapon. He later pled guilty to this offense. (At this point the officers did not know the weapon had been used to kill Touring.) Alonzo was not arrested. The defense offered no rebuttal evidence, and the motion was denied. The defense reurged its objection at trial to the admission of the evidence when Byrd testified.

Byrd's testimony at trial was essentially the same as it was at the pretrial hearing, but with more detail and a few additions. He testified at trial that he stopped Alonzo after Alonzo pulled out in front of him from a curb in a residential area. He could not remember if there were other cars on the street. He gave Alonzo a ticket for driving without a license.

### Application

 A voluntary consensual search is an exception to the probable cause and warrant requirements of the Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution. *Meeks v. State*, 692 S.W.2d 504, 509 (Tex.Crim.App.1985) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973));

*Kolb v. State*, 532 S.W.2d 87, 89 (Tex.Crim. App.1976); *Vargas v. State*, 18 S.W.3d 247, 253 (Tex.App.-Waco 2000, pet. ref'd). The State has the burden of proof by clear and convincing evidence [7] that consent was freely and voluntarily given.[8] *State v. Ibarra*, 953 S.W.2d 242, 245 (Tex.Crim. App.1997); *Meeks*, 692 S.W.2d at 509; *Kolb*, 532 S.W.2d at 89. Whether consent was voluntary is determined from the totality of the circumstances. *Meeks*, 692 S.W.2d at 510; *Kolb*, 532 S.W.2d at 90; *Vargas*, 18 S.W.3d at 253. While we defer to the trial court for fact findings, we review *de novo* whether consent was voluntary. *Vargas*, 18 S.W.3d at 253; *see Guzman*, 955 S.W.2d at 87.

 The unrebutted testimony from Officer Byrd was that Alonzo gave voluntary, uncoerced consent to search his vehicle. Byrd never drew his weapon and obtained consent before the back-up officers arrived. While Byrd did not warn Alonzo he did not have to give consent, the warning is not required by law.[9] *Roth v. State*, 917 S.W.2d 292, 303 (Tex.App.-Austin 1995, no pet.). An officer's testimony that consent was voluntarily given can be sufficient evidence to prove that it was. *Martinez v. State*, 17 S.W.3d 677, 683 (Tex. Crim.App.2000); *Allridge v. State*, 850 S.W.2d 471, 492–93 (Tex.Crim.App.1991); *Morris v. State*, 50 S.W.3d 89, 99 (Tex. App.-Fort Worth 2001, no pet. h.). Therefore, Alonzo's only remaining claim is that Byrd lacked a legal reason to stop his car.

 Neither the record nor the briefs indicate the specific traffic violation

---

7. The federal constitution requires only a preponderance standard. *United States v. Matlock*, 415 U.S. 164, 176–78, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974).

8. The defendant has the initial burden to show there was a search without a warrant. *Russell v. State*, 717 S.W.2d 7, 9 (Tex.Crim. App.1986).

9. Failure to warn constitutes an important factor in determining whether valid consent was given. *Byrd v. State*, 835 S.W.2d 223, 226 (Tex.App.—Waco 1992, no pet.) (citing *Meeks v. State*, 692 S.W.2d 504, 510 (Tex. Crim.App.1985)).

Officer Byrd witnessed Alonzo commit which authorized Byrd to stop him. However, Byrd testified that Alonzo proceeded from a parked position against a curb into traffic without using a turn signal. We note that section 545.104 of the Transportation Code states: "An operator shall use the signal authorized by Section 545.106 to indicate an intention to turn, change lanes, or start from a parked position." TEX. TRANSP. CODE ANN. § 545.104 (Vernon 1999). Although we do not know from the record if this was the violation the trial court found, a judicial ruling will not ·be reversed on appeal, even if made for the wrong reason, if the ruling is supported by the record and correct on any theory of law applicable to the case. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996); *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Calloway v. State*, 743 S.W.2d 645, 652 (Tex.Crim.App. 1988).[10] Therefore, Byrd had a legal reason, probable cause, to stop Alonzo.

Issues one and two are overruled.

## EXCLUSION OF "ALTERNATIVE PERPETRATOR" EVIDENCE

Alonzo's defenses were an alibi and an "alternative perpetrator" theory. The alibi defense he presented at trial was composed of the testimony of Alonzo's parents and friends that he was at home or elsewhere during the afternoon when the mur-

der occurred. However, Alonzo also attempted to present a defense in which he would try to prove that Gerald Landon ("Lannie") Donner killed Touring. Donner was the initial suspect based on the statements of alleged eyewitness James Kern. Donner was arrested soon after the crime, but the case against him was dismissed in February 1998 when the State changed its theory of who committed the murder, just after Tara Hatcher came forward with her story. Alonzo wanted to present a video statement from Kern and testimony from four live witnesses. The trial court refused to allow any of the evidence, calling it hearsay.[11] Alonzo made offers of proof for all five witnesses. TEX.R. EVID. 103(a)(2). He complains in points of error ten through fourteen that the trial court erred in not admitting the evidence.

### The Offers of Proof

■ The most important of the five witnesses was Kern, who had made a video-taped statement. The defense subpoenaed Kern to testify, but his attorney told the court that Kern, who was currently charged in County Court at Law with making a false police report that Donner killed Touring, would invoke his Fifth Amendment right not to testify.[12] Therefore, the defense proffered the video statement.[13]

---

10. Similarly, when officers give the wrong reason for why their actions were legal under the Fourth Amendment, the case will not be reversed if the facts support a correct reason. *Williams v. State*, 726 S.W.2d 99, 100–01 (Tex.Crim.App.1986); *Esco v. State*, 668 S.W.2d 358, 366 (Tex.Crim.App.1982).

11. Court: As to the alternative about this other person that supposedly committed this crime, that case has been dismissed. The district attorney has said that, authorities said it, there's no indication. I hear a lot of dope smoking, cocaine snorting, gang members,

out here talking among themselves and who knows what they may or may not say ....

12. The defense also subpoenaed Donner. The prosecutor offered to the court to contact an attorney for him in case he too wanted to invoke his Fifth Amendment right. Later, on the record, Donner did invoke the protection.

13. The video is included in the record. Initially, the trial judge did not want to include it.

Defense Counsel: Judge, on making a proffer on what Mr. Kern would say, is it some-

Shortly after the murder, Kern reported to police that Donner killed Touring.[14] On July 23, 1997, five police detectives and officers with a video recorder accompanied Kern to the location where Touring was found dead. Kern was read his *Miranda* rights. Then Kern led the detectives and officers around the site describing precisely what happened. In the tape, Kern said that on July 6 he drove with Donner and Touring in Donner's blue pickup to the Cliffs. Donner was driving. He said the incident occurred about 2:30. He correctly described the clothes Touring was wearing, a t-shirt and jeans; he said Touring was wearing Reebok sneakers. Kern knew Donner as "Lannie" but did not know his last name. Donner had told Kern he intended to "put [Touring] in the hospital if not kill him." Donner lured Touring to the scene by arranging to buy cocaine from him.

The three got out of the pickup and walked toward the lake with Touring in the lead and Kern trailing. Donner had a pistol in his waistband. While standing at the top of an embankment, Donner suddenly pulled his gun, pushed Touring ahead, and shot him in the back. Donner shot Touring again in the back of the neck or head. (Touring was shot at the rear of his jaw.) Touring was still twitching, so Donner shot a third time into his face. (Touring was shot to the left of his eye.)

Donner retrieved one of the three shell casings. (Two shell casings were recovered by police from the scene.)

After the murder, Donner stole Touring's watch, ring, Reeboks, and pocket contents.[15] Kern and Donner left the scene. Donner threatened Kern not to tell anyone and dropped him off at his residence. Later that night, Donner came over. He offered the Reeboks to Kern and then to Kern's roommate, Brandon Smith. Kern refused the offer, and the shoes were too small (size eleven) for Smith. Donner asked to take a shower. He took off Touring's watch, and when he left he forgot the watch. Kern later gave the watch to police; it was never positively identified as belonging to Touring.

In addition to the video statement, Alonzo proffered the testimony of four witnesses. Andrea Lipchak, age twenty-three at the time of the murder, testified at trial out of the jury's presence that on the night before the murder, she was at a party at Justin Marriott's house. Donner and Touring were there, and they completed a cocaine transaction. Lipchak's testimony was not hearsay.

Courtney Graham, age fifteen at the time of the murder, testified at trial out of the jury's presence that she was Touring's best friend. At one time Donner dated her mother.[16] She said that after she

---

thing that I can do at the time of deliberations?

Court: First place, you can't do it because he has invoked his Fifth Amendment right, it has no place in this record. All that is gross speculation on what somebody might think he would say. He has invoked his Fifth Amendment right, it's not a part of this record and won't be a part of it. Let me ask you, do you have your alibi witnesses here so that we can get rid of them? Because if we're going to go through this hassle for some time, I'm going to listen to those witnesses that are going to testify and

we can send this jury home as we're going to have to come back on Monday.

14. The record indicates that Donner and Alonzo did not know each other; they may have had mutual friends or acquaintances.

15. Touring's back-pack, left in the pickup, was also kept by Donner.

16. Donner was in his late thirties. He pled guilty in 1987 to two counts of burglary of a vehicle and was sentenced to five years in prison.

learned Touring was dead, she heard "hearsay around the town of who allegedly had done the shooting," which caused her to remember an implied threat Donner had made against Touring six to eight months before. Specifically, Donner said "if Mr. Touring f—cked up over that [Donner] would kill the motherf—ker." Graham said Touring usually wore tennis shoes. Her testimony about the threat and her observation of the tennis shoes was not hearsay.

Jonathan Miller and Timothy O'Shields lived out of state at the time of trial and planned to come to Texas to testify. To avoid that, the trial court admitted written statements from them as offers of proof.

Jonathan Miller, age seventeen at the time of the murder, made a sworn written statement to police on July 11, 1997. He said that on the night before the murder, he was at his home with a number of people including Donner. Donner and others left to buy cocaine. When they returned, Donner tried the cocaine and was dissatisfied with its quality. Donner called the seller and demanded his money back. Then he left to collect his money, claiming he had a 9 mm pistol. The day of the murder, Donner came over about 6 p.m. and was high on cocaine. Miller's testimony about these events was not hearsay.

Timothy O'Shields, age sixteen at the time of the murder, also made a sworn written statement to police on July 11, 1997. He said Donner was age thirty-eight and drove a blue pickup. He knew Donner had either a .45 caliber pistol or a 9 mm pistol. On the night before the murder, he was at Miller's house and Donner was there. Miller was his best friend. Touring, whom he had known for thirteen years, called the house. He knew Touring

was a drug dealer. Donner spoke with Touring on the telephone about prices for drugs. Donner, O'Shields, and a third person left for Justin Marriott's house where they purchased cocaine. On return, Donner tried the cocaine which he said was no good. He left about 1:00 a.m. saying "It will be taken care of." The day after the murder, O'Shields spoke with Donner on the telephone. Donner said "no problem," that he "took care of it." O'Shields testimony was not hearsay.

O'Shields also swore to an affidavit on August 5, 1999. He restated that Donner bought cocaine from Touring, was not pleased with it, said he would "take care" of it, and said on the telephone "no problem," he "had taken care of it."

The testimony of Lipchak, Graham, Miller, and O'Shields is only relevant to corroborate and support Kern's story about the murder. Therefore, the admissibility of all this evidence depends on the admissibility of Kern's video statement.

The parties' briefs discuss whether or not Kern's statement is a statement against his penal interest or whether it contains statements by Donner against his penal interest, both exceptions to hearsay under Rule 803(24). Tex.R. Evid. 803(24). We have reviewed the videotape, and find that Kern makes no self-incriminating statements.[17] Kern does recite some statements by Donner against Donner's penal interest which may have been admissible; yet the overriding question remains whether the videotape was admissible. We do not find that the videotape falls under any hearsay exception in the rules of evidence. If it was admissible, it must be for another reason than that the rules of evidence allow it.

---

17. Under this theory, Kern's involvement in the crime is similar to Hatcher's and Taga-meyer's involvement under the State's theory.

### The Right to Present a Defensive Theory

The United States Supreme Court has recognized a due-process right to present a defensive theory. In *Washington v. Texas,* two men were indicted for murder and separately tried. 388 U.S. 14, 16, 87 S.Ct. 1920, 1921, 18 L.Ed.2d 1019 (1967). One was convicted before the other was tried. He was willing to testify at the trial of the co-defendant that he committed the murder without the aid of the co-defendant. *Id.* At that time, Texas had statutes preventing accomplices from testifying for each other, although they could testify for the State against each other. *Id.,* 388 U.S. at 16, 87 S.Ct. at 1922. The Court said:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.,* 388 U.S. at 19, 87 S.Ct. at 1923. The Court held that the defendant's Sixth Amendment right to have compulsory process for witnesses in his favor was incorporated in the due process clause of the Fourteenth Amendment, and therefore applies to the states. *Id.,* 388 U.S. at 18, 87 S.Ct. at 1923. The Texas evidentiary statutes were declared unconstitutional in violation of the Sixth Amendment right to compulsory process and the Fourteenth Amendment right to due process. *Id.,* 388 U.S. at 23, 87 S.Ct. at 1925.

In *Webb v. Texas,* the defendant called a single witness in his defense. 409 U.S. 95, 96, 93 S.Ct. 351, 352, 34 L.Ed.2d 330 (1972). Before the witness was examined by defense counsel, the trial court gave the witness a lengthy and intimidating admonishment not to lie, else he would be indicted and convicted of perjury and sentenced to prison. *Id.* The witness then refused to testify, and the court excused him. *Id.,* 409 U.S. at 96, 93 S.Ct. at 353. Citing *Washington* for the proposition that the right to present a defense is a "fundamental element of due process of law," the Court found the trial court's admonishment to have violated the defendant's due-process rights. *Id.,* 409 U.S. at 98, 93 S.Ct. at 353.

Following closely after *Webb* was *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Mississippi had a hearsay exception for statements against pecuniary interest, but not for statements against penal interest. Therefore, Chambers was prevented from calling three witnesses who would have testified that someone other than the defendant told them he committed the murder. *Id.,* 410 U.S. at 298, 93 S.Ct. at 1047. The Court stated that "[o]ut-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury." *Id.* (citing *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970)). However, the Court found that the hearsay statements from the three witnesses "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.,* 410 U.S. at 300, 93 S.Ct. at 1048. Pertinent to Alonzo, the Court noted there was corroborating

evidence the hearsay was true, and the State had the opportunity to cross-examine the declarant. The Court said "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.*, 410 U.S. at 302, 93 S.Ct. at 1049 (citing *Webb*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330; *Washington*, 388 U.S. at 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019; *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948)). The Court found that the excluded testimony "bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to [the] defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* The Court held that excluding these witnesses, coupled with a "voucher" rule which prohibited the defense from cross-examining the confessed murderer, violated due process.

Finally, in *Rock v. Arkansas*, the defendant was prohibited by a state evidentiary rule from presenting testimony based on her hypnotically refreshed memory of the crime. 483 U.S. 44, 46–48, 107 S.Ct. 2704, 2706–07, 97 L.Ed.2d 37 (1987). The Court said a defendant has a constitutional right to testify in her own defense. *Id.*, 483 U.S. at 50–51, 107 S.Ct. at 2708–09 (citing *Faretta v. California*, 422 U.S. 806, 819, n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975); (quoting *In re Oliver*, 333 U.S. at 273, 68 S.Ct. at 507)). It cited *Washington* for the principle that a defendant has the right to call witnesses in his favor. *Id.*, 483 U.S. at 52, 107 S.Ct. at 2709. It also cited *Chambers* for the principle that when the defendant proffers hearsay critical to his defense, which bears " 'assurances of trustworthiness' including corroboration by other evidence,"

if "the State [does not] demonstrate that the hearsay testimony … would be unreliable," it should be admitted. *Id.*, 483 U.S. at 55, 107 S.Ct. at 2711. The Court stated: "A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." *Id.*, 483 U.S. at 61, 107 S.Ct. at 2714. The conviction was reversed.

The Court of Criminal Appeals has also recognized the right of a defendant to present a defense. In *Coleman v. State*, the defendant wanted to attempt to prove that the illegal drugs the arresting officer testified he found in the defendant's car had been planted by the officer because police in the city had a grudge against the defendant. 545 S.W.2d 831, 832 (Tex. Crim.App.1977). The trial court excluded the evidence. The Court said "the trial court fell into error for two reasons: (1) The appellant had the right to impeach the arresting officer's credibility by showing him to be a past member of a class who has been and will continue to be severely prejudiced against appellant. (2) The appellant had the right to support his defensive theory." *Id.*

### *Application*

These cases establish: (1) the right to present a defensive theory is constitutional, and (2) rules of evidence, and in particular hearsay rules, must be flexible and must sometimes bend to the due-process rights of the defendant. The decision as to whether otherwise inadmissible evidence should be admitted because of due-process concerns is made on a case-by-case

basis. Factors the Supreme Court has considered in the cases cited are:

- what was the inherent trustworthiness of the hearsay;

- was there corroborating evidence that the hearsay is truthful;

- how important to the determination of guilt/innocence is the hearsay;

- did the State have an opportunity to examine the declarant of the hearsay;

- did the State demonstrate the unreliability of the hearsay.

■ We focus on the video statement because, as previously stated, if Kern's video statement is admissible, then the other four witnesses' testimony would be admissible at trial because their testimony (1) is not hearsay and (2) is relevant to corroborate and support Kern's statement. Thus, applying the five factors to the facts and circumstances of this case to determine whether the court erred in refusing to admit the video statement, we find:

1. There was evidence that Kern's video statement was inherently trustworthy. The police (five officers) recorded the statement at the murder scene after "Mirandizing" Kern on the tape. Kern knew the precise location of the murder and the body. Also, Kern knew details an eyewitness would know, such as the locations of the wounds, what Touring was wearing, that Touring was found without shoes, and why one of the three shell casings was not found at the scene. In addition, the form of Kern's statement, a video-recording, allows a judge at a hearing or a jury at trial to observe his demeanor as an aid to determining his credibility. Finally, compared with the usual case in which hearsay is conveyed at trial by a third-person who recounts what the declarant said, this hearsay is recounted by the declarant,

Kern, thus eliminating any distortions by a third-person.

2. There was corroborating evidence that Kern's statement was truthful. The testimony of Lipchak, Graham, Miller, and O'Shields combined provide a motive for Donner to commit the crime, i.e., that the night before the murder, Touring sold Donner bad drugs and Donner got even the next day. In addition, Miller and O'Shields testified that Donner had a gun, and O'Shields testified that the day after the murder, Donner said he "took care of it," meaning his complaint about Touring.

3. The video statement and the supporting testimony of Lipchak, Graham, Miller, and O'Shields were very important to Alonzo's defense. Without them, he had an easily discounted alibi defense composed of friends and family, versus the State's two eyewitnesses, a confession by Alonzo to a third party, and the recovery of the murder weapon from Alonzo's car. The "alternative perpetrator" defense was the most effective defense Alonzo had.

4. The State had the opportunity to examine Kern extensively before trial. It was police who took Kern's initial statement and the video statement. The State knew about Kern and his story about the murder, and knew that the defense knew about Kern, the video, and the other four witnesses. The State cannot claim unfair surprise. In addition, although the State has no Sixth Amendment right to confront defense witnesses, nevertheless it could have immunized Kern (and Donner), called him to testify at trial, and examined him. E.g., Graham v. State, 994 S.W.2d 651, 656 (Tex.Crim.App.1999) ("Transactional immunity," i.e., immunity from prosecution, requires the approval of the court. "Use immunity," i.e., immunity from use of self-incriminating statements made while testifying, is at the discretion of the prosecu-

tor.) [18]

5. The State did not demonstrate the unreliability of Kern's video statement. At a hearing the day before trial, defense counsel and the prosecutor made non-evidentiary proffers about the "Donner" theory. However, the State made no proffer that it had direct evidence that might show the witnesses were lying or had a motive to lie. Its comments were essentially limited to: (a) Touring's fingerprints were not found (weeks later) on Donner's truck; (b) Tara Hatcher said Donner was bragging he killed someone, but Donner and Alonzo had mutual acquaintances who could have relayed to Donner details of the crime; [19] (c) the watch Kern said Donner left at Kern's house which was allegedly stolen from Touring was confirmed by one witness as belonging to Touring, but Touring's mother was not able to conclusively identify it; (d) none of Touring's property was recovered from Donner (Donner never interviewed with police); (e) the murder had been talked about by numerous people, and Kern could have learned details of the crime that way; (f) Donner had made inquiries with the District Attorney's Office about expunging the record of his arrest for the murder. This was the most the State could proffer the day before trial to call Kern's credibility and the unreliability of his statement into question.

■■■ We review a trial court's refusal to admit evidence for abuse of discretion, which means we review for whether the court's ruling was within the zone of reasonable disagreement. *Montgomery v.* *State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990) (op. on reh'g). We note that Alonzo's inability to present Kern (and Donner) as a witness at trial was not due to any fault or omission of his own. His attempt to subpoena Kern was thwarted by the Fifth Amendment. Applying the five factors used by the Supreme Court, we conclude that under the facts and circumstances of this case, Alonzo had a due-process right to present his "alternative perpetrator" evidence even though it included hearsay. Therefore, the trial court abused its discretion in not admitting Kern's video statement. As noted, if the video statement was admitted, the four live witnesses' testimony would also be admissible.

### Harm Analysis

■■■ Although we are dealing with a question of the admissibility of evidence, because the question arises out of the application of a constitutional right, we review for constitutional error. *See Hernandez v. State*, 2001 WL 1415274 (Tex.Crim. App. Nov. 14, 2001). We must reverse for a constitutional error unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. Tex. R.App. P. 44.2(a); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We conduct this review according to the standards set out in *Harris v. State*, 790 S.W.2d 568 (Tex.Crim.App. 1989).

> "[A] reviewing court ... should not focus upon the propriety of the outcome

18. We do not reach the issue of whether under principles of due process, a defendant should have the right to have a defense witness immunized who has refused to testify claiming Fifth Amendment protection. *E.g. Autry v. McKaskle*, 465 U.S. 1085, 1087–88, 104 S.Ct. 1458, 1460–61, 79 L.Ed.2d 906 (1984) (Marshall, dissent); *United States v. Follin*, 979 F.2d 369, 374 (5th Cir.1992)

("[J]udicially ordered immunity may be sanctioned to stem governmental abuse.").

19. This does not explain why Kern would tell police that he was present during the murder, as opposed to telling them Donner confessed and described to Kern the details of the crime.

of the trial," but rather "should be concerned with the integrity of the process leading to the conviction. ... [T]he reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making; it should ask not whether the jury reached the correct result, but rather whether the jurors were able properly to apply law to facts in order to reach a verdict. Consequently, the reviewing court must focus upon the process and not on the result. In other words, a reviewing court must always examine whether the trial was an essentially fair one. If the error was of a magnitude that it disrupted the juror's orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted. Again, it is the effect of the error and not the other evidence that must dictate the reviewing court's judgment."

*Id.* at 587–88.

■■■ Without knowing how the State would have endeavored to attack the credibility of the defensive theory that Donner was the murderer, we can only observe that on its face, Alonzo was prepared to present a plausible alternative theory of the case. Furthermore, deciding which theory of the murder to believe, the State's or Alonzo's, is a matter for the jury. Based on this record, we cannot say beyond a reasonable doubt that the error did not contribute to the conviction. *Id.* at 586; Tex.R.App. P. 44.2(a).

Points of error ten through fourteen are sustained.

## OTHER POINTS OF ERROR

Because we will reverse the judgment, we do not decide Alonzo's other points of error.

## CONCLUSION

Because the trial court erred in excluding the "alternative perpetrator" evidence, we reverse the judgment and remand the cause for a new trial. On retrial, the trial court should conduct a hearing into the admissibility of the "alternative perpetrator" evidence pre-trial or outside the presence of the jury. Tex.R. Evid. 104(c).

Justice GRAY dissenting.

TOM GRAY, Justice, dissenting.

The trial court did not abuse its discretion in refusing to admit the videotape of Kern, nor the testimony of Graham, Lipchak, Miller, and O'Shields. The hearsay exception relied upon by Alonzo for the introduction of the videotape is Rule 803(24). That rule provides: "A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Tex.R. Evid. 803(24). "The focus of this inquiry is on verifying to the greatest extent possible the trustworthiness of the statement so as to avoid the admissibility of a fabrication." *Davis v. State,* 872 S.W.2d 743, 747 (Tex. Crim.App.1994). The *Davis* Court also stated:

> The burden lies with the party seeking to admit the statement, and the test is not an easy one; the evidence of corroborating circumstances must *clearly* indicate trustworthiness. *See United States v. Salvador,* 820 F.2d 558, 561 (2nd Cir.) (suspicion with which drafters regarded such statements by third parties is reflected in fact that burden is on accused to justify admission of statement and corroboration which must "clearly" indicate trustworthiness is "not an insignificant hurdle"), *cert. denied,* 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 398 (1987).

*Id.*

The parties and the trial court understood on whom the burden was placed. In

an effort to comply with Rule 803(24), outside the presence of the jury, Alonzo attempted to establish corroborating circumstances to indicate the trustworthiness of the videotape through the testimony and proffer of testimony from Graham, Lipchak, Miller, and O'Shields. After viewing the videotape and considering the testimony of these four witnesses, the trial court held that the evidence was not admissible. The trial court told Alonzo, "I am not shutting you off." The trial court was not going to allow testimony that did not meet the requirements for admission under the rules of evidence. The State was also prepared to present additional proof of the unreliability of the out of court statements of Kern, if necessary, to rebut Alonzo's evidence. Without the video-taped statement of Kern in evidence, or some other evidence linking Donner to the murder of Andrew Touring, the proffered testimony of Graham, Lipchak, Miller, and O'Shields, was not relevant and was properly excluded. This does not mean that if the tape was admitted the testimony of Graham, Lipchak, Miller, and O'Shields was admissible; rather, the testimony of each must still satisfy the requirements of the rules of evidence.

The majority contends that the testimony simply does not fit within the rules of admissibility for any existing rule and searches for another vehicle to allow Alonzo to introduce the evidence. But the majority also notes that "Kern's involvement in the crime is similar to Hatcher's and Tagameyer's involvement under the State's theory." (Majority opinion at page 357, footnote 17). The majority determined that Hatcher's and Tagameyer's conduct could factually have been construed by the jury as being that of an accomplice, and the trial court gave the appropriate instruction regarding accomplice witness testimony. Likewise, there is sufficient indication of Kern's involvement in the offense, as described by him on the video, to raise the factual issue of whether he was an accomplice. Specifically, Kern states on the video that he knew that the reason Donner was taking Touring to a secluded place was to "jack him up." Kern also said Donner was going to "put him in the hospital, if not kill him." Kern went with Donner with the knowledge of the plan and knowing Donner was carrying a pistol. Because Kern's knowledge of the purpose of taking Touring to a desolate area and that Donner was carrying a pistol could lead to the logical inference that Kern was more than an idle bystander, a jury would have been justified in determining that he was an accomplice in the murder of Touring as described on the video. Thus, if Alonzo had satisfied his burden of proof to establish the reliability of the hearsay statement by Kern, the videotape would have been admissible as a statement against penal interest. Tex.R. Evid. 803(24).

Alternatively, even if an exception is created to allow for the admission of testimony that is not otherwise admissible under the rules of evidence, the exception should not be easier to meet than the requirements under other rules of evidence. The exception to the hearsay rule created by the majority should, at the very least, place the burden on the party offering the evidence to establish its reliability, similar to Rule 803(24). As for the evidence recited by the majority as establishing the trustworthiness of the videotape, Alonzo offered no testimony about whether or not the details of the murder were widely known in the community, or if the police had released that level of detail at the time of Kern's statement.

The record does not support a determination that the trial court erred in excluding the video-taped statement of Kern, or the testimony of the four other witnesses.

Alonzo did not meet his burden of proof regarding the reliability of the statements on the video. Because the majority concludes otherwise, I respectfully dissent.

### HARM ANALYSIS

Additionally, the majority applies the improper standard in conducting its harm analysis. The exclusion of testimony, particularly cross-examination testimony, can always be linked to the constitutional rights of due-process and confrontation. But every decision regarding the admission or exclusion of evidence is not a constitutional issue. It has been consistently held that the admission or exclusion of evidence is entrusted to the discretion of the trial court and is reviewed as non-constitutional error. *See Fairow v. State*, 943 S.W.2d 895, 901 (Tex.Crim.App.1997); *Carroll v. State*, 916 S.W.2d 494, 503 (Tex. Crim.App.1996); *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex.Crim.App.1990); *Kelley v. State*, 22 S.W.3d 642, 646 (Tex.App.-Waco 2000, pet. ref'd). Accordingly, appellate rule 44.2(b) defines the harm analysis for non-constitutional error as:

> Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

TEX.R.APP. P. 44.2(b). Thus, I also respectfully dissent from the application of the constitutional harm analysis.

### OTHER ISSUES

Finally, the majority fails to address other issues that will undoubtedly occur on remand, such as the introduction of Alonzo's juvenile records. The State and Alonzo are entitled to have those issues resolved. Because the issues cannot be resolved in a dissenting opinion, I am limited to commenting on the majority's failure to resolve them.