COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

                                        NO.
2-08-021-CR

STEPHEN MOLE                                                                  APPELLANT

                                                   V.

THE STATE OF TEXAS                                                                STATE

                                              ------------

             FROM
THE 16TH DISTRICT COURT OF DENTON COUNTY

                                              ------------

                                MEMORANDUM
OPINION[1]

                                              ------------

                                       I. 
Introduction








A jury found Appellant Stephen Mole guilty of
intoxication manslaughter (count I) and intoxication assault (counts II and
III), assessed his punishment at twenty years=
imprisonment for count I and ten years=
imprisonment for counts II and III, and recommended that the sentence for count
II be suspended and that Mole be placed on probation.  The trial court entered judgment and
sentenced Mole accordingly, ordering that the sentences for counts I and III
run consecutively and that the sentence for count II run concurrently.  In nine points, Mole argues that the trial
court erred by excluding certain evidence at the guilt-innocence stage of his
trial, by refusing to submit lesser included offense and causation instructions
to the jury, and by admitting certain victim impact and character evidence at
the punishment stage of trial.  We will
affirm.

II.  Factual and Procedural Background

Members of two New Hampshire families, the
Cordeses and the Gateses, visited Texas to attend a wedding.  Around 10:00 p.m. on the night of the
wedding, they decided to leave the wedding reception and return to their
hotel.  Gene Cordes drove their rental
car, and his friend Don Gates sat in the front passenger seat.  Gene=s wife
Beverly Brooks, their son Griffin Cordes, and Don=s wife
Marilyn Gates sat in the backseat.  Gene
was driving south on Marsh Lane near Carrollton.  As he approached the intersection of Marsh
Lane and Hebron Parkway, the left turn arrow turned green, and he began
executing a left-hand turn onto Hebron.  








Mole was driving his Ford Expedition west on
Hebron and ran the red light at the intersection, colliding with Gene=s rental
car.  The rental car spun out of control,
and Marilyn and Beverly were thrown from the car.  Marilyn died at the hospital that night.  Griffin and Beverly both spent several days
in the hospital receiving treatment for their injuries and continued to have
medical difficulties stemming from the accident through the date of trial.  A grand jury ultimately indicted Mole for one
count of intoxication manslaughter and two counts of intoxication assault.   

At trial, six eyewitnesses testified for the
State.  The driver and two passengers of
a Lincoln Navigator that was heading west on Hebron testified that Mole sped
past them and never applied his brakes before colliding with the rental
car.  All three of those witnesses
testified that the light on Hebron was red when Mole entered the
intersection.  Tim Raine and his fiancé,
who were also heading west on Hebron that night, testified that Mole passed
them while driving at a high speed and that he swerved in and out of
lanes.  They approached the intersection
of Hebron and Marsh as the collision was happening.  Raine testified that the light was red when
he saw the accident and that Mole Aappeared
to run a red light.@ 
Laurel Jentgen, the sixth eyewitness to testify for the State, explained
that she had been driving north on Marsh that night and had just received a
green left turn arrow and executed a left hand turn to head west on Hebron when
she heard the crash behind her.  








Officer Brian Vannucci of the Carrollton Police
Department was the first officer on the scene. 
He testified that Mole smelled of alcohol and that his eyes were red and
watery, but he explained on cross-examination that the air bags in Mole=s
vehicle had deployed and that this would cause a driver=s eyes
to redden.  Mole was able to carry on a
conversation with the officer and told the officer that he had consumed three
to four glasses of wine that evening. 
Former state trooper Chris Van Dyk,[2]
the primary investigator for the accident, testified that he also spoke with
Mole when he arrived at the scene.  He
noticed that Mole walked in a normal fashion but that his breath smelled of
alcohol.  Van Dyk conducted sobriety
tests on Mole, determined that he was intoxicated, and arrested him.  

Officer Jeff Heinemeyer of the Carrollton Police
Department testified that approximately two and a half hours after the
accident, he spoke with Mole at the hospital and noticed that Mole=s breath
had a faint odor of alcohol and that his eyes were glossy and bloodshot.  At the hospital, Mole consented to a blood
test, and the lab results showed that his blood contained 0.12 grams of alcohol
per 100 milliliters of blood.[3]   








Michael Brighton testified as Carrollton=s
supervisor of traffic operations.  He
explained that the traffic lights at the intersection of Marsh and Hebron were
working normally on the date of the accident. 
He explained that it is impossible for traffic on Hebron to have a green
light while traffic on Marsh also has a green left turn arrow and that any
malfunctioning of the lights results in flashing red lights for all traffic
stopped in any direction at the intersection. 


The defense called Mole=s
long-time friend June Wise, who testified that she received a call from Mole
around 10:00 or 10:30 that night and that Mole sounded concerned but otherwise
normal.  Mole=s sister
testified that she ate dinner with Mole and their parents at a restaurant that
night and that Mole drank wine at dinner, but she did not know how much.  She said that Mole seemed fine when they left
the restaurant.  The defense also called
eyewitness Gloria Castillo to testify; she read from the affidavit she wrote
the night of the accident that Mole=s
vehicle Awas
speeding to make the light when it was turning red.@  She further testified that Mole=s light
was red when he entered the intersection and that she did not see him apply his
brakes.  Castillo also testified that
before the accident, Mole almost hit her car and that she had to move out of
his way. 

III. Evidence 

In his first, second, fifth, sixth, and seventh
points, Mole argues that the trial court abused its discretion by excluding
certain evidence at trial.  In his eighth
and ninth points, he argues that the trial court abused its discretion by
admitting certain evidence at the punishment stage of trial.  We will address each of these arguments
below.








A. 
Standard of Review

We review a trial court=s
decision to admit or to exclude evidence under an abuse of discretion standard.
Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); see
Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).  A trial court does not abuse its discretion
as long as the decision to admit or to exclude the evidence is within the zone
of reasonable disagreement.  Montgomery
v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh=g). 

B. 
Exclusion of Hearsay Statements

In his first and second points, Mole argues that
the trial court abused its discretion by refusing to allow him to cross-examine
Officer Heinemeyer about, and introduce a videotape of, Officer Heinemeyer=s
remarks to Officer Van Dyk concerning certain unknown witnesses=
comments to Officer Heinemeyer at the scene. 

1.  The
Excluded Evidence

The seven eyewitnesses who testified at trial
also wrote affidavits on the night of the accident detailing what they saw, and
these affidavits were admitted into evidence at trial.  A videotape from the scene demonstrated that
at one point Officer Heinemeyer remarked to Officer Van Dyk, 








AThree people that are
over here, uh, I don=t know what you want from
them other than these affidavits but they are sitting here.  None of, none of the three are very
intelligent individuals, which is about par for the course, but, uh, they=re saying the light was
yellow going to red when he made his turn . . . the Expedition.@   

 

Officer Heinemeyer then said, AAnd so
what I was hearing from them is that they were guaranteeing it was red.  So, I don=tCyou know
how that goes.@ 
About eleven minutes following this statement, Officer Heinemeyer asked
Van Dyk if he Astill needs these other
witnesses over here?@ 
Van Dyk said that the witnesses could leave and that he had Aplenty
of witness statements.@ 

Mole=s first
trial ended in a mistrial.  During that
trial, the trial court ruled that no hearsay statements regarding the color of
the stop light would be admissible before the jury.  Before Mole=s second
trial, the trial court adopted for the second trial all of its pretrial rulings
and all agreements as if the mistrial did not occur.  

At Mole=s second
trial, the following exchange took place between the prosecutor and Officer
Heinemeyer on direct examination:

Q  Now, at any point, did you have any contact
with any civilians [at the scene] that said, [A]Hey, I saw the crash?[@]

 

A  Yes, I did.

 

Q  At what point during your stay here on the
crash scene did you encounter those people?

 








A  Several times throughout my stay.  The initial stay when I was laying the flare
line, people were coming up and saying, [A]I saw the accident; I saw what happened.[A]  Several different things people said that
would indicate they saw what took place.

 

. . . . 

 

Q  Now, as far as the witnesses are concerned,
did you ever provide them a witness statement, anything paper-wise to write
down their statement?

 

A  Yes, I did.

 

Q  Do you recall, what, if anything, you told
them to put in that statement?

 

. . . . 

 

A  It was one person that came up.  I handed him a stack of affidavits and said,
[A]What I need is for the
top portion to be filled out and a narrative portion put in there, where you
were, and what you saw . . . .[A]  A lot of
them were in a hurry, and so they wanted to go ahead and start on the
affidavits.  And then they actually
approached me at the back of my car as I was getting more flares.  We stopped traffic, got them across.  I don=t know if it was a male or female.  It was one of the witnesses that walked off
with a stack of affidavits.

 

Q  Did you tell them to go to a particular
location to do this?

 

A  Yes.

 

Q  Where did you corral them?

 

A  In the northeast corner of the 7-Eleven
parking lot.

 

 








During cross-examination, the defense attempted
to elicit testimony from Officer Heinemeyer concerning the conversations and
interactions the officer had with the witnesses who said that the light was
yellow going to red:

Q  Because you were asked by the State of Texas
just a minute ago, the government asked you, [A]Did people say, [>]hey, I just witnessed a
crash.[>@]  Do you remember when the government=s attorney just asked you
that?

 

A  Yes, I do.

 

Q  In fact, some of the people that came up to
you said, [A]Hey, the light was yellowB[A]

 








The State then objected, and the trial court held a hearing outside
the jury=s
presence, at which time the State argued that the question sought inadmissable
hearsay and that the trial court had ruled previously that what certain unknown
witnesses had told Officer Heinemeyer at the scene was inadmissible hearsay.  During the hearing, Officer Heinemeyer agreed
that he had told Van Dyk that some people had approached him Aat the
very end, after I started collecting witness affidavits,@ and had
told him that the light Awas yellow going to red.@  The trial court ruled that it would stand by
its original ruling excluding evidence of what these unidentified witnesses
told Officer Heinemeyer.[4]  Ultimately, the videotape recording was
admitted into evidence and played for the jury with this audio portion
muted.  

2.  No Due
Process or Confrontation Clause Violation

In his first point, Mole argues that the exclusion
of the above evidence violated his due process right to present a defense.  See U.S. Const. amend. VI, XIV.  








In some instances, the exclusion of a defendant=s
evidence can amount to a violation of the right to compel the attendance of
witnesses in the defendant=s
favor.  Williams v. State, 273
S.W.3d 200, 232 (Tex. Crim. App. 2008) (citing Potier v. State, 68
S.W.3d 657, 659 (Tex. Crim. App. 2002)). 
The Sixth Amendment, made applicable to the states through the
Fourteenth Amendment, is a firm guarantor of the constitutional assurance of
compulsory process to obtain favorable witnesses.  Id. 
(citing Washington v. Texas, 388 U.S. 14, 87 S. Ct. 1920
(1967)).  When an application of the
evidentiary rules would be A>fundamentally
unfair=@ or
constitutional rights directly affecting the ascertainment of guilt are
implicated, the rules A>may not
be applied mechanistically to defeat the ends of justice.=@  Id. (quoting Chambers v.
Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049 (1973)).  In other words, in an appropriate case,
evidentiary rules, like those prohibiting hearsay, should yield to
constitutional protections.  Id.  But this does not mean that every erroneous
exclusion of a defendant=s evidence amounts to a
constitutional violation.  Id.

Evidentiary rulings rarely rise to the level of
denying the fundamental constitutional right to present a meaningful
defense.  Potier, 68 S.W.3d at
659.  There are two distinct scenarios in
which rulings excluding evidence might rise to the level of a constitutional
violation: (1) when a state evidentiary rule categorically and arbitrarily
prohibits the defendant from offering otherwise relevant, reliable evidence
that is vital to his defense; and (2) when a trial court=s
clearly erroneous ruling excluding otherwise relevant, reliable evidence that
forms such a vital portion of the case effectively precludes the defendant from
presenting a defense.  Id. at 659B62; Wiley
v. State, 74 S.W.3d 399, 405 (Tex. Crim. App.), cert. denied, 537
U.S. 949 (2002).  In the first scenario, Athe
constitutional infirmity is in the arbitrary rule of evidence itself.@  Wiley, 74 S.W.3d at 405.  In the second scenario, Athe rule
itself is appropriate, but the trial court erroneously applies the rule to
exclude admissible evidence to such an extent that it effectively prevents the
defendant from presenting his defensive theory.@  Id. 








Here, Mole does not claim that Officer Heinemeyer=s
testimony and his videotaped statements to Van Dyk regarding what certain
unknown witnesses told him fall under an exception to the hearsay rule; rather,
he contends that the exclusion of this evidence effectively precluded him from
presenting a defense.  See Potier,
68 S.W.3d at 659B62.  Mole heavily relies on our sister court=s
opinion in Alonzo v. State to support his argument.  See 67 S.W.3d 346, 358B62 (Tex.
App.CWaco
2001, pet. dism=d).  

In Alonzo, the Waco Court of Appeals noted
that factors to consider in determining whether otherwise inadmissible evidence
should be admitted because of due process concerns include (1) the inherent
trustworthiness of the hearsay; (2) any corroborating evidence that the hearsay
is truthful; (3) the hearsay=s
importance to the determination of guilt-innocence; (4) the State=s
opportunity to examine the declarant of the hearsay; and (5) the State=s
demonstration, if any, of the unreliability of the hearsay.  Id. at 359B60.  The excluded evidence in Alonzo
included a videotaped statement by a person who claimed to have been an eyewitness
to the killing and said that someone other than the defendant had committed the
crime and statements by four others corroborating and supporting the alleged
eyewitness=s story of the murder.  Id. at 356.  The court of appeals held that the trial
court erred by excluding this evidence in violation of Alonzo=s due
process right to present his Aalternative
perpetrator@ defense.  Id. at 361B62.













In this case, the statements made by the unknown
witnesses to Officer Heinemeyer were trustworthy to the extent that they were
made to a police officer shortly after the accident, but they were not
corroborated by any other evidence, were not against the speaker=s
interest (in fact, we do not even know the speaker), and were not directly
exculpatory to Mole (in fact, Officer Heinemeyer=s
recitation of the witnesses=
statements that Athe light was yellow going to
red when he made his turn . . . the Expedition,@ is
factually incorrect and confusing because Mole, who was driving the Expedition,
did not turn at the intersection).  See,
e.g., Chambers, 410 U.S. at 300, 93 S. Ct. at 1048 (holding that
statements provided considerable assurance of reliability when spontaneously
made to a close acquaintance shortly after the incident, corroborated by some
other evidence in the case, and made against declarant=s
interest).  Unlike in Alonzo, the
videotape here shows that the statements were conveyed by a third person
(Officer Heinemeyer) who recounted what the witnesses said, possibly distorting
their actual statements.  See Alonzo,
67 S.W.3d at 360 (A[C]ompared with the usual case
in which hearsay is conveyed at trial by a third-person who recounts what the
declarant said, this hearsay is recounted by the declarant . . . thus eliminating
any distortions by a third-person.@).  And unlike in Alonzo, the videotape
here did not record the unknown witnesses telling Officer Heinemeyer that the
light was yellow, nor did it show Officer Heinemeyer when he relayed to Van Dyk
what these witnesses had told him,[5]
thus preventing the trial court from observing Officer Heinemeyer=s or the
unknown witnesses= demeanors to aid in any
credibility determination.  See id.     On
the videotape, immediately after Officer Heinemeyer told Van Dyk that some
witnesses had said Athe light was yellow going to
red when he made his turn . . . the Expedition,@ he
said, A[T]hey
were guaranteeing it was red.@   [Emphasis added.]  Even Mole points out on appeal the
conflicting nature of these statements, acknowledging that A[o]ne
assumes the witnesses are referring to [Mole=s]
light; however, it is also possible that they were referring to Gene Cordes= light.@  If the witnesses were referring to Mole=s
Expedition, they were guaranteeing his light was red.  If they were referring to Gene=s rental
car, these statements are unsupported by any other evidence.  The unclear nature of Officer Heinemeyer=s
remarks to Van Dyk adds to the unreliability of the witnesses=s
hearsay statements.  See Stevens v.
State, 234 S.W.3d 748, 788 (Tex. App.CFort
Worth 2007, no pet.) (holding that excluded statement that defendant had hit
child lacked indicia of reliability because it was unclear whether declarant=s
statement referred to spanking the children on occasion).  








As further evidence of the unreliability of these
hearsay statements, unchallenged evidence established that neither Gene Cordes
nor Laurel Jentgen could have had green lights unless Mole=s light
had been red for two seconds.[6]   Moreover, five eyewitnesses who were
traveling in the same direction and on the same road as Mole that night
testified that Mole entered the intersection while the light was red.  In light of the evidence that Mole ran the
red light on Hebron, we cannot say that the hearsay statements of unknown
witnesses recounted by Officer Heinemeyer are inherently trustworthy.  See Alonzo, 67 S.W.3d at 360; see
also Hall v. State, No. 05-04-01313-CR, 2005 WL 1706304, at *3 (Tex. App.CDallas
July 22, 2005, no pet.) (not designated for publication) (considering the lack
of trustworthiness in the offered testimony and the testimony=s
contradiction with the substantial amount of evidence showing appellant=s guilt
in holding that trial court did not abuse its discretion by prohibiting
testimony).








In an effort to show that the hearsay statements
were corroborated by other evidence, Mole points to Gloria Castillo=s
statement in her affidavit that Mole Awas
speeding to make the light when it was turning red,@ as well
as evidence that there had been Asome
complaint about the cycling of the lights at the intersection only the day
before the incident.@ 
But Castillo did not swear in her affidavit that Mole did not run the
red light; instead, she simply stated that he was speeding to make the light
when it was turning red.  At trial,
Castillo further explained the statement in her affidavit.  She testified affirmatively that the light
was red when Mole entered the intersection. 


The purported complaint about the cycling of the
lights at the intersection likewise does not corroborate the proffered
hearsay.  Brighton, Carrollton=s
supervisor of traffic operations, testified that the day before the accident a
citizen complained that the light on Marsh Awas
taking too long to change to green from a red color.@  He stated that an employee Adid a
full check of the signal@ and determined that the stop
lights were functioning properly.  Thus,
the evidence cited by Mole is not corroborative of the hearsay statements, and
we find no other evidence in the record to corroborate them.  See Alonzo, 67 S.W.3d at 360.








Mole next argues that his sole defensive theory
was causation and that, consequently, the hearsay evidence that the light was Ayellow
going to red@ was very important to his
defense.  The exclusion of this hearsay,
however, did not thwart Mole=s
ability to present a defense.  See
Wiley, 74 S.W.3d at 408 (holding that exclusion of evidence precluded
appellant Afrom presenting some of
his evidence that perhaps Mr. Thomas was somehow involved in the
commission of this arson@ but did not preclude appellant
from presenting defense).  In his
defense, Mole presented evidence that Van Dyk, the primary investigator,
conducted a shoddy investigation, is untrustworthy, and is no longer a state
trooper.  Mole=s sister
testified that Mole ate dinner with her and their parents immediately prior to
the accident, that he drank wine with dinner, and that he Aseemed
fine@ when
they left the restaurant.  She was not
concerned about Mole driving their parents and himself home.  Mole=s
longtime friend also testified that she received a call from Mole around the
time of the accident and that his speech was normal.  

The trial court=s
exclusion of the hearsay at issue did not deny Mole the fundamental
constitutional right to present a meaningful 
defense.  See Potier, 68
S.W.3d at 663.  For the above reasons, we
hold that the trial court=s exclusion of Officer
Heinemeyer=s videotaped statements to Van
Dyk and his testimony that some people told him that the light was yellow going
to red did not violate Mole=s due
process rights.  See Stevens, 234
S.W.3d at 788; Hall, 2005 WL 1706304, at *3.  

 

 








3.  No
Violation of Rule of Optional Completeness

In his second point, Mole argues that the trial
court violated Texas Rule of Evidence 107 by prohibiting him from introducing
the same evidence at issue in his first point. 
See Tex. R. Evid. 107. 
Specifically, he argues that because Officer Heinemeyer testified on
direct examination that several individuals told him that they saw the accident
occur, the rule of optional completeness allowed evidence of what those
individuals told the officer, i.e., that the light was Ayellow
going to red.@ 
    

Rule 107 provides that

[w]hen part of an act,
declaration, conversation, writing or recorded statement is given in evidence
by one party, the whole on the same subject may be inquired into by the other,
and any other act, declaration, writing or recorded statement which is
necessary to make it fully understood or to explain the same may also be given
in evidence, as when a letter is read, all letters on the same subject between
the same parties may be given.

 

Id. 








     This rule is one of
admissibility and permits the introduction of otherwise inadmissible evidence
when that evidence is necessary to fully and fairly explain a matter Aopened
up@ by the
adverse party.  Walters v. State,
247 S.W.3d 204, 218 (Tex. Crim. App. 2007); West v. State, 121 S.W.3d
95, 103 (Tex. App.CFort Worth 2003, pet. ref=d).  It is designed to reduce the possibility of
the jury receiving a false impression from hearing only a part of some act,
conversation, or writing, and it takes effect when other evidence has already
been introduced but is incomplete or misleading.  Walters, 247 S.W.3d at 218; West,
121 S.W.3d at 103.  Once an evidentiary
door has been opened by one side, this rule serves to allow the other side to
complete the picture.  West, 121
S.W.3d at 103.  Rule 107 does not permit
the introduction of other similar but inadmissible evidence unless it is
necessary to explain properly admitted evidence.  Walters, 247 S.W.3d at 218.  Further, the rule is not invoked by the mere
reference to a document, statement, or act. 
Id.  And it is limited by
rule 403, which permits a trial judge to exclude otherwise relevant evidence if
its unfair prejudicial effect or its likelihood of confusion of the issues
substantially outweighs its probative value. 
Id.; see Tex. R. Evid. 403.








Here, Officer Heinemeyer=s
testimony that people at the scene said they saw what happened did not leave a
false impression with the jury, and the excluded statements were not necessary
to fully understand the officer=s
testimony; he further testified that people were approaching him while he was
laying the flare line on the scene and that he gave one person a stack of
affidavits so that witnesses could begin writing down what they saw.  See Walters, 247 S.W.3d at 218; West,
121 S.W.3d at 103.  Mole argues that the
excluded evidence was necessary because the State left a false impression that Aall the
statements made by persons at the scene were supportive of the light=s being
red.@  But Van Dyk testified that he did not talk to
every witness on the scene, thus informing the jury that not all witnesses
testified at trial.  

We hold that the trial court=s
decision to exclude the statements at issue did not violate rule 107=s
doctrine of optional completeness and that, consequently, the trial court did
not abuse its discretion by excluding Officer Heinemeyer=s
testimony about these statements.  See
Walters, 247 S.W.3d at 217; West, 121 S.W.3d at 100. 

4. 
Harmless Error

Finally, even assuming arguendo that the
trial court abused its discretion by excluding this evidence, and even assuming
that this rose to the level of a constitutional error, we apply rule 44.2(a)
and hold that any such error was harmless beyond a reasonable doubt.  See Tex. R. App. P. 44.2(a); Williams
v. State, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997); see also Alonzo,
67 S.W.3d at 362 (applying rule 44.2(a) to error in admissibility of evidence
when error violated defendant=s due
process right to present a defense).  In
applying the Aharmless error@ test,
our primary question is whether there is a Areasonable
possibility@ that the error might have
contributed to the conviction.  Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999).








Our harmless error analysis should not focus on
the propriety of the outcome of the trial; instead, we should calculate as much
as possible the probable impact on the jury in light of the existence of other
evidence.  Wesbrook v. State, 29
S.W.3d 103, 119 (Tex. Crim. App. 2000), cert. denied, 532 U.S. 944
(2001).  We consider the source and
nature of the error, the extent that it was emphasized by the State, its
probable collateral implications, the weight a juror would probably place on
the error, and whether declaring it harmless would be likely to encourage the
State to repeat it with impunity.  Harris
v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).  This requires us to evaluate the entire
record in a neutral, impartial, and even-handed manner, not Ain the
light most favorable to the prosecution.@  Id. at 586.








Here, evidence that three individuals told
Officer Heinemeyer that the light was Ayellow
going to red when he made the turn@ would
have helped Mole=s causation defense, but we
cannot say that there is a Areasonable
possibility@ that the error, if any, in
excluding this evidence might have contributed to the conviction.  See Mosley, 983 S.W.2d at 259.  The jury heard eyewitness testimony that Mole
was speeding and swerving in and out of lanes prior to the accident, that the
light was red when Mole entered the intersection, and that Mole never applied
his brakes before colliding into Gene=s rental
car.  Gene and Jentgen both testified
that they received green turn arrows before turning left onto Hebron from
Marsh, and evidence at trial showed that it would have been impossible for
traffic on Marsh to have green turn arrows at the same time that traffic on
Hebron had a green light.  Eyewitness
Castillo wrote in her affidavit that Mole Awas
speeding to make the light when it was turning red@ and
eyewitness Raines wrote in his affidavit that Mole Aappeared
to run a red light,@ but these statements do not
contradict the evidence that the light was red. 
The videotape played for the jury shows Van Dyk asking Mole whether he
remembered seeing a red light, to which Mole responded, ANo sir,
I may have.  I may have looked down.  I may have been distracted.@  Van Dyk also testified that Mole told him he
did not recall applying his brakes or attempting to brake.  Numerous witnesses testified that the light
was clearly red when Mole entered the intersection








 After
assuming constitutional error, carefully reviewing the record, and performing
the required harm analysis under rule 44.2(a), we alternatively conclude beyond
a reasonable doubt that the trial court=s
refusal to admit the complained-of evidence did not contribute to Mole=s
conviction or punishment.  See Tex.
R. App. P. 44.2(a); Simpson v. State, 119 S.W.3d 262, 271 (Tex. Crim.
App. 2003), cert. denied, 542 U.S. 905 (2004).  Because we have alternatively held that the
exclusion of this evidence was harmless as a constitutional error, we likewise
hold it was harmless as nonconstitutional error to the extent Mole also
complains of its exclusion under his doctrine-of-optional-completeness
argument.  See Tex. R. App. P.
44.2(b).  Consequently, even assuming
error, we overrule Mole=s first and second points.

C. 
Cross-Examination to Show Bias

In his fifth, sixth, and seventh points, Mole
argues that the trial court abused its discretion by excluding evidence and
prohibiting cross-examination of Van Dyk to show his bias or motive to testify
in favor of the State.  Mole argues that
this error violated Texas Rule of Evidence 613[7]
and his right to confront witnesses under the Texas and United States
Constitutions.[8]  See U.S. Const. amend. VI; Tex. Const.
art. I, ' 10;
Tex. R. Evid. 613.  

1.  Mole=s
Proffered Evidence








Prior to the mistrial in Mole=s first
trial, the defense attorney sought to admit a written complaint investigation
of Van Dyk=s job performance from the Texas
Highway Patrol (the THP).  The written
investigation included several allegations that Van Dyk had violated various
THP policies on specific prior occasions when he (1) allowed his wife to ride
in his official car without approval, (2) went home on several occasions when
he should have been at work, (3) failed to check his car radio during that time
period, (4) falsely documented the hours he worked in weekly reports, (5)
failed to investigate or respond to specific accidents, and (6) failed to
assist co-workers with patrol duties when requested on at least four
occasions.  The report included a
recommendation that Van Dyk be discharged.  


The trial court held a hearing outside the jury=s
presence in which the defense attorney made an offer of proof, questioning Van
Dyk.  During the offer of proof, the
defense attorney asked Van Dyk if he agreed that some of the allegations
against him were crimes.  Based on this
questioning, the trial court stopped the proceedings and appointed counsel for
Van Dyk.  After consulting with an
attorney, Van Dyk answered most of the questions regarding the investigation
against him, but he invoked his Fifth Amendment privilege when questioned about
falsifying time sheets.  He testified
that he was not aware of any current investigation against him based on this
allegation and that the State did not offer him any type of immunity for his
testimony in this case. 








At a pre-trial hearing in Mole=s second
trial, his defense attorney re-urged the admission of the written investigation
and cross-examination of Van Dyk on these allegations as evidence of Van Dyk=s bias
or motive to testify for the State.  The
trial court ruled that its prior ruling would stand and refused to admit the
evidence.  

2.  Prior
Statements Showing Bias








The Sixth Amendment and Texas Rule of Evidence
613 protect a defendant=s right to cross-examine a
witness regarding bias or motive.  See
U.S. Const. amend. VI; Tex. R. Evid. 613(b) (describing the procedure for
impeaching a witness by proof of circumstances or statements showing bias or
interest on the part of such witness); Davis v. Alaska, 415 U.S. 308,
315B17, 94
S. Ct. 1105, 1110B11 (1974).  A defendant is entitled to pursue all avenues
of cross-examination reasonably calculated to expose a motive, bias, or
interest for the witness to testify.  Carpenter
v. State, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998); Carroll v. State,
916 S.W.2d 494, 497 (Tex. Crim. App. 1996). 
But the trial court has broad discretion to limit cross-examination in
order to avoid harassment, prejudice, confusion of the issues, endangering the
witness, the injection of cumulative or collateral evidence, and marginally
relevant interrogation.  Carpenter,
979 S.W.2d at 634; Lagrone v. State, 942 S.W.2d 602, 613 (Tex. Crim.
App.), cert. denied, 522 U.S. 917 (1997).  The trial court exceeds its discretion only
when it prohibits a defendant from engaging in otherwise appropriate
cross-examination designed to show a prototypical form of bias on the part of a
witness.  Felan v. State, 44
S.W.3d 249, 254 (Tex. App.CFort
Worth 2001, pet. ref=d) (citing Lagrone, 942
S.W.2d at 613).

The United States Supreme Court has established
the appropriate three-prong analysis for determining whether a denial of the
Sixth Amendment Confrontation Clause right of cross‑examination is
harmless error.  See Delaware v. Van
Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986).  Initially, under the first prong, we must
assume that the damaging potential of the cross-examination was fully realized.
 Id.; Shelby v. State, 819
S.W.2d 544, 550B51 (Tex. Crim. App. 1991).  Under the second prong, we then must perform
our review under these factors: (1) whether the witness=s
testimony was important to the prosecution=s case;
(2) whether the testimony was cumulative; (3) whether there was evidence
corroborating or contradicting the testimony of the witness on material points;
(4) whether and to what extent cross‑examination was otherwise permitted;
and (5) whether the prosecution=s case
was strong.  Van Arsdall, 475 U.S.
at 684, 106 S. Ct. at 1438; Shelby, 819 S.W.2d at 547; Curry v. State,
861 S.W.2d 479, 482B83 (Tex. App.CFort
Worth 1993, pet. ref=d).  Finally, keeping the first two prongs in
mind, we determine whether the error was harmless beyond a reasonable
doubt.  Tex. R. App. P. 44.2(a); Shelby,
819 S.W.2d at 547.













Here, assuming without deciding that the trial
court abused its discretion by prohibiting cross-examination of Van Dyk
regarding the internal investigation against him, we will perform the required
harm analysis.  See Van Arsdall,
475 U.S. at 684, 106 S. Ct. at 1438; Shelby, 819 S.W.2d at 547.  Regarding the first factorCthe
importance of Van Dyk=s testimony to the State=s caseCwe agree
with the State that Van Dyk=s
testimony was not of particular importance to the State=s
case.  See Van Arsdall, 475 U.S.
at 684, 106 S. Ct. at 1438.  The State
called twenty witnesses in its case in chief, including six eyewitnesses to the
accident.  Van Dyk did not testify as an
expert and the State did not qualify him on the subject of sobriety testing or
use his testimony to establish how he administered the tests or how Mole
performed on the tests.[9]  On direct examination, Van Dyk identified
Mole as the driver of the Expedition, testified that he smelled alcohol on Mole=s
breath, confirmed that he performed field sobriety tests on Mole as shown on
the videotape, and testified that he drove Mole to the hospital, where Mole
consented to a blood test.  Van Dyk also
testified that he maintained the chain of custody of the blood.  In view of the strength of the State=s case,
we cannot say that Van Dyk=s
testimony was of great importance to the State. 
See id.; Smith v. State, 236 S.W.3d 282, 294 (Tex. App.CHouston
[1st Dist.] 2007, pet. ref=d).

Regarding the second factorCwhether
the testimony was cumulativeCother
witnesses identified Mole as the driver of the Expedition, two other officers
testified that they smelled alcohol on Mole=s
breath, and other evidence introduced at trial showed that Mole was intoxicated
that night.  See Van Arsdall, 475
U.S. at 684, 106 S. Ct. at 1438.  Mole=s sister
testified that Mole drank wine with dinner that night.  Van Dyk was the only officer to testify
regarding how he maintained the chain of custody of Mole=s
blood.  

A review of the third factorCcorroborating
or contradicting testimonyCdemonstrates
that Van Dyk=s determination that Mole was
intoxicated was indirectly contradicted only by Mole=s sister
and his family friend; both testified that Mole seemed Afine@ on the
night of the accident.  See id.,
106 S. Ct. at 1438.  There was no evidence
that Mole had not been drinking that night; his sister said he drank wine with
dinner.  Several neutral witnesses
corroborated Van Dyk=s opinion that Mole was
intoxicated.








Regarding the fourth factorCwhether
cross-examination was otherwise permittedCVan Dyk=s
cross-examination spans almost one hundred pages; his direct examination spans
less than fifteen pages.  See id.,
106 S. Ct. at 1438.  Mole=s
defense attorney cross-examined Van Dyk regarding whether he made mistakes
during, and properly conducted, the field sobriety tests and the investigation
of the accident, including whether he improperly shredded notes from the
investigation against standard THP procedures. 
Van Dyk testified on cross-examination that he was no longer a state trooper
and that he had questioned his own credibility during the same period of time
that he was investigating this accident. 
Mole=s defense attorney successfully
introduced into evidence an apology letter from Van Dyk regarding his bad
performance as a state trooper.  In
addition to the lengthy cross-examination regarding Van Dyk=s
credibility, Mole also called two officers to testify to their opinion of Van
Dyk=s
credibility.  Van Dyk=s former
supervisor testified that he personally thought, and knew of other individuals
who thought, that Van Dyk=s credibility as an individual
and as a state trooper was Aoverall
bad.@  State trooper Rudy Torrez testified that he
knew Van Dyk and was of the opinion that Van Dyk was not credible or truthful. 

Regarding the last factor, we previously have
explained that the State presented a strong case against Mole.  








Finally, after assuming that the damaging
potential of the cross-examination was fully realized, reviewing the factors
discussed above, and keeping in mind both the damaging potential and the five
factors, we look to whether the trial court=s error,
if any, in prohibiting cross-examination of Van Dyk regarding the internal
investigation against him was harmless beyond a reasonable doubt.  See Shelby, 819 S.W.2d at 547 (citing
Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438).  Given the evidence of Mole=s guiltCeyewitness
testimony about his erratic driving and excessive speed before entering the
intersection and that he ran a red light, testimony that the intersection stop
lights were working properly, Mole=s own
admission that he had been drinking that night and may have looked down and not
seen the red light, and other officers=
testimony that Mole smelled of alcoholCthe jury
could have convicted Mole without Van Dyk=s
testimony.  We conclude, therefore, that
even if the trial court abused its discretion when it precluded Mole from cross‑examining
Van Dyk specifically about the THP=s
internal investigation of him, any error did not contribute to his conviction
beyond a reasonable doubt.  See id.
(citing Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438).  Accordingly, Mole=s fifth,
sixth, and seventh points are overruled.

D.  Victim Impact and
Victim Character Evidence

In his eighth and ninth points, Mole argues that the trial
court abused its discretion by admitting certain victim impact and victim
character evidence because no nexus exists between the complained-of testimony and
his personal responsibility and moral guilt and because the evidence was
irrelevant and unfairly prejudicial. 








1.  Evidence
Introduced at the Punishment Stage

At the punishment stage of trial, the court heard testimony
from multiple witnesses, three of whom are at issue here.  Don Gates, the husband of Marilyn Gates,
testified that Marilyn had worked for American Airlines and that when
he flew home with Marilyn=s body, the American Airlines
flight crew stood up as her body was removed from the plane to show their
respect for her.  He described how his
three children have responded to the death of their motherCone son
will not talk about his mother, one son has become immersed in his work and his
family, and their daughter has become very involved in MADD.  Don also testified that his family is no
longer as close as they used to be because Athe
cement that bonded [them] together is gone.@ 

Beverly Brooks, who was injured in the accident
and was a close friend of Marilyn=s,
testified to the effect that Marilyn=s death
has had on her family.  She described the
loss of Marilyn as creating a Abig void@ in the
lives of her family members.  She also
testified about her injuries and her son Griffin=s
injuries. 








Marilyn=s
daughter Melissa Larochelle testified that her mother was her best friend.  Melissa explained that she was pregnant at
the time of the accident and had planned for her mother to be involved in the
birth of her first child.  Melissa
testified that her grandfather has difficulty speaking about Marilyn and that
her grandmother will not talk about Marilyn at all.  Melissa stated that her siblings and parents
used to get together every Sunday but that her brothers no longer participate
and that her family has only been together twice since the accident. 

2.  Admissibility of Victim Impact and Character
Evidence

 

The procedures to be followed at the punishment
stage of trial and the evidence that may be considered in determining
punishment are the subject of article 37.07 of the Texas Code of Criminal
Procedure.  See Tex. Code Crim.
Proc. Ann. art. 37.07 (Vernon Supp. 2008). 
This statute authorizes the admission of evidence at the punishment
stage of trial as to any matter the court deems relevant to sentencing.  Id. 









Victim impact evidence is evidence concerning the
effect the victim=s death will have on others,
particularly the victim=s family members.  Haley v. State, 173 S.W.3d 510, 517
(Tex. Crim. App. 2005) (citing Mosley, 983 S.W.2d at 261).  It is designed A>to
remind the jury that the person whose life was taken was a unique human being.=@  Salazar v. State, 90 S.W.3d 330, 335
(Tex. Crim. App. 2002) (quoting Payne v. Tennessee, 501 U.S. 808, 823B25, 111
S. Ct. 2597, 2607B08 (1991)).  Victim character evidence, on the other hand,
is defined as evidence concerning the good qualities of the victim.  Id. 
It also serves to show each victim=s
uniqueness as an individual human being and, therefore, the unique loss
suffered by society and the victim=s family
because of the victim=s death.  Payne, 501 U.S. at 823B25, 111
S. Ct. at 2607B08.  Victim character evidence is designed to
remind the jury that crime has foreseeable consequences to the community and
the victim=s family and friends.  Salazar, 90 S.W.3d at 335.  Both victim impact and character evidence are
Aadmissible
at the punishment stage of a criminal trial when that evidence has some bearing
on the defendant=s personal responsibility and
moral culpability.@ 
Id. 








Victim impact and character evidence that is
relevant may still be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice. 
See Tex. R. Evid. 403; Boone v. State, 60 S.W.3d 231, 239
(Tex. App.CHouston [14th Dist.] 2001, pet.
ref=d), cert.
denied, 537 U.S. 1006 (2002) (noting that A[i]t
does appear that victim impact evidence can run afoul of rule 403@ and
that the court of criminal appeals has cautioned courts to place appropriate
limits on such evidence).  Rule 403
provides that relevant evidence Amay be
excluded if its probative value is substantially outweighed by the danger of
unfair prejudice.@ 
Tex. R. Evid. 403.  Considerations
in determining whether testimony should be excluded under rule 403 should
include the nature of the testimony, the relationship between the witness and
the victim, the amount of testimony to be introduced, and the availability of
other testimony relating to victim impact. 
Salazar, 90 S.W.3d at 336. 
In order to avoid unfair prejudice under rule 403, courts are encouraged
to place appropriate limits on the amount, kind, and source of victim impact
and character evidence that is allowed.  Id.

When considering the admissibility of victim
impact and character evidence, the court must consider the following factors:
(1) how probative is the evidence, (2) the potential of the evidence to impress
the jury in some irrational, but nevertheless indelible way, (3) the time the
proponent needs to develop the evidence, and (4) the proponent=s need
for the evidence.  Id.

3.  Evidence Relevant to Mole=s 

Personal Responsibility
and Moral Culpability

 








Here, Mole argues that the testimony outlined
above was irrelevant because the crimes he committed did not have a mens rea
element and, consequently, Athe
nature of the offense@ shows that there is no nexus
between the testimony and Mole=s
personal responsibility and moral guilt. 
Mole cites no authority, nor do we find any, supportive of this
proposition.  To the contrary, the
evidence had a bearing on Mole=s moral
culpability as a reminder of the foreseeable consequences of driving while
intoxicated to the community and the victims=
families and friends.  See Salazar,
90 S.W.3d at 335; Lane v. State, 822 S.W.2d 35, 41 (Tex. Crim. App.
1991), cert. denied, 504 U.S. 920 (1992).  In that regard, the evidence is relevant to
show the circumstances of the offense.  See
Jones v. State, 963 S.W.2d 177, 182 (Tex. App.CFort
Worth 1998, pet. ref=d); see also Jagaroo v. State,
180 S.W.3d 793, 798B99 (Tex. App.CHouston
[14th Dist.] 2005, pet. ref=d)
(noting that testimony from family members of victims of intoxication assault
and intoxication manslaughter, as well as testimony of victim of intoxication
assault, were admissible as circumstances of offenses).  

The victim impact testimony regarding how Marilyn=s death
impacted  her family and her friend
Beverly=s family
illustrated the consequences that Mole=s
actions had on the victim=s family and friends.  See Salazar, 90 S.W.3d at 335; see
also Moreno v. State, 38 S.W.3d 774, 778 (Tex. App.CHouston
[14th Dist.] 2001, no pet.) (holding as admissible grandmother=s
testimony of psychological impact crime had on members of deceased=s
extended family, including suicide of deceased=s
uncle); Boone, 60 S.W.3d at 240 (allowing testimony from decedent=s son
that he missed his mother and as to his mother=s good
qualities); Jones v. State, 963 S.W.2d 177, 182 (Tex. App.CFort
Worth 1998, pet. ref=d) (holding that testimony from
family=s
minister was admissible when he described the impact of the victim=s death
on the victim=s family as a Adisaster@). 








Regarding the victim character evidence of a
tribute by American Airlines employees to Marilyn, the trial court could have
reasonably concluded that the State was not comparing the victim=s worth
to anyone else, but instead was illustrating the victim=s Auniqueness
as an individual human being.@ Payne,
501 U.S. at 823, 111 S. Ct. at 2607.  This
testimony illustrated the victim=s many
years of service to her employer.  See
Solomon v. State, 49 S.W.3d 356, 366 (Tex. Crim. App. 2001) (holding that
picture of victim in sailor=s
uniform simply reflected the victim=s
occupation and did not encourage comparisons between victim and other members
of society).  It focused on the victim=s
individual loyalty and service, as opposed to comparing her employment to other
members of society.  Cf. Mosley,
983 S.W.2d at 262 (finding evidence impermissible when it shifts from
humanizing the victim and illustrating the harm caused by the defendant to
measuring the worth of the victim compared to other members of society).

4. 
Evidence Not Unfairly Prejudicial








Regarding Mole=s rule
403 complaint, the testimony at issue here was given by two immediate family
members of the victim and one of the victim=s close
friends, all of whom had close relationships to the victim.  See Boone, 60 S.W.3d at 240.  The testimony was probative to illustrate
the uniqueness of the victim and the harm caused by her death.  See Williams v. State, 176 S.W.3d 476,
483 (Tex. App.CHouston [1st Dist.] 2004, no
pet.) (permitting testimony from victim=s mother
regarding victim=s character and effect of victim=s death
on her as probative to show the uniqueness of the victim and the harm caused by
victim=s
death); see also Mosley, 983 S.W.2d at 265 (finding testimony
from three of victims= family members admissible, even
though it related somewhat to the character of the victims, because it mainly
focused on the impact of the victims= loss of
family members).  The testimony was not
prejudicial based on its volume; the questioning of these witnesses comprised
about twenty pages.  See Salazar,
90 S.W.3d at 336; Williams, 176 S.W.3d at 483.  The questions and answers were brief, to the
point, and not needlessly cumulative.  See
Boone, 60 S.W.3d at 240.  Thus, the
record does not reflect that the probative value of this evidence was
substantially outweighed by its prejudicial effect.  See Tex. R. Evid. 403.

Based on this record, we conclude that the
testimony was relevant and that its admission did not unfairly prejudice Mole
and was within the zone of reasonable disagreement.  See Manning v. State, 114
S.W.3d 922, 926 (Tex. Crim. App. 2003); Boone, 60 S.W.3d at 240.  Accordingly, we hold that the trial court did
not abuse its discretion by allowing this testimony.  See Salazar, 90 S.W.3d at 336; Williams,
176 S.W.3d at 483; Mosley, 983 S.W.2d at 262.  We overrule Mole=s eighth
and ninth points.








IV. 
Proposed Jury Charges

In his third and fourth points, Mole contends
that the trial court erred by refusing his requested jury charges on the lesser
included offense of driving while intoxicated (DWI) and on causation.  We will address each of these points
separately below.

A.  Lesser
Included Offense Charge

We use a two-step analysis to determine whether
an appellant was entitled to a lesser included offense instruction.  Hall v. State, 225 S.W.3d 524, 528 (Tex.
Crim. App. 2007); Rousseau v. State, 855 S.W.2d 666, 672B73 (Tex.
Crim. App.), cert. denied, 510 U.S. 919 (1993).  First, the lesser offense must be established
by proof of the same or less than all the facts required to establish the
commission of the offense charged.  Tex.
Code Crim. Proc. Ann. art. 37.09 (Vernon 2006); Moore v. State, 969
S.W.2d 4, 8 (Tex. Crim. App. 1998); see Hall, 225 S.W.3d at 536.  








Second, some evidence must exist in the record
that would permit a jury to rationally find that if the appellant is guilty, he
is guilty only of the lesser offense.  Hall,
225 S.W.3d at 536; Salinas v. State, 163 S.W.3d 734, 741 (Tex. Crim.
App. 2005); Rousseau, 855 S.W.2d at 672B73.  The evidence must be evaluated in the context
of the entire record.  Moore, 969
S.W.2d at 8.  There must be some evidence
from which a rational jury could acquit the appellant of the greater offense
while convicting him of the lesser included offense.  Id. 
The court may not consider whether the evidence is credible,
controverted, or in conflict with other evidence.  Id. 
Anything more than a scintilla of evidence may be sufficient to entitle
a defendant to a lesser charge.  Hall,
225 S.W.3d at 536.  Thus, we review the
trial court=s decision to deny Mole=s
request for a lesser included offense instruction under these standards.








Regarding the first step in our analysis, the
misdemeanor offense of DWI is a lesser included offense of intoxication
manslaughter.  See Tex. Penal Code
Ann. '
49.04(a) (Vernon 2003), 49.08 (Vernon Supp. 2008); Henry v. State, 263
S.W.3d 151, 154 (Tex. App.CHouston
[1st Dist.] 2007, no pet.) (ABecause
intoxication manslaughter includes all of the elements of DWI, intoxication
manslaughter includes the proof required to establish the offense of driving
while intoxicated.@).  A required element in the charged offense of
intoxication manslaughter is causing the death of another by reason of the
intoxication, which is not required in the requested lesser offense of
DWI.  Henry, 263 S.W.3d at 154
(comparing section 49.08(a) with section 49.04(a)). It is not enough that
operation of a vehicle, even by an intoxicated person, causes the death;
rather, the Adeath must be the result of the
intoxication and proof must be made . . . of that thing which worked a causal
connection between the intoxication and the death.@  Daniel v. State, 577 S.W.2d 231, 233
(Tex. Crim. App. 1979); see Glauser v. State, 66 S.W.3d 307, 313 (Tex.
App.CHouston
[1st Dist.] 2000, pet. ref=d) (op.
on reh=g), cert.
denied, 534 U.S. 1129 (2002).

Regarding the second step of the analysis, Mole
specifically argues that he was entitled to a jury charge on the lesser
included offense of DWI because eyewitness Castillo=s
affidavit and testimony supported the theory that the stop light was only
yellow turning to red, rather than red, as Mole drove through the
intersection.  But as we have previously
explained, Castillo=s affidavit statement is not
evidence that Mole did not run the red light; rather, it is evidence that Mole
was speeding to make the light when it was turning red.  And Castillo explained her affidavit
statement at trial by stating that the light was red when Mole entered the
intersection.  Consequently, Castillo=s
affidavit statement does not constitute some evidence that Mole did not run the
red light, and we find no such evidence in the record that would permit a jury
to rationally find that Mole was guilty only of DWI.  See Hall, 225 S.W.3d at 536; Salinas,
163 S.W.3d at 741; Rousseau, 855 S.W.2d at 672B73.  We hold that the trial court did not err by
refusing to instruct the jury on the lesser included offense of DWI and
overrule Mole=s third point.

 

 








B. 
Causation Charge

In his fourth point, Mole argues that the trial
court erred by refusing his requested jury instruction on concurrent
causation.  The requested instruction
identified two alternative independent causes for the collision other than Mole=s
intoxication:  (1) that the traffic
control device malfunctioned or (2) that Gene Cordes disregarded a traffic
control device.  

An accused is entitled to an instruction on every
defensive issue raised by the evidence.  Muniz
v. State, 851 S.W.2d 238, 254 (Tex. Crim. App.), cert. denied, 510
U.S. 837 (1993).  Appellate review
of error in a jury charge involves a two-step process.  Abdnor v. State, 871 S.W.2d 726, 731
(Tex. Crim. App. 1994).  Initially, we
must determine whether error occurred.  Id.
at 731.  If so, we must then
evaluate whether sufficient harm resulted from the error to require
reversal.  Id. at 731B32.








The relevant law concerning concurrent causation
provides that A[a] person is criminally
responsible if the result would not have occurred but for his conduct,
operating either alone or concurrently with another cause, unless the
concurrent cause was clearly sufficient to produce the result and the conduct
of the actor clearly insufficient.@  Tex. Penal Code Ann. ' 6.04
(Vernon 2006).  Thus, for concurrent
causation to be raised by the evidence, there must be evidence both that a
concurrent cause was sufficient to cause the result and that the conduct of the
defendant was clearly insufficient to cause the result.  See Hutcheson v. State, 899 S.W.2d 39,
42 (Tex. App.CAmarillo 1995, pet. ref=d). 








On appeal, Mole argues that the trial court
erroneously denied his concurrent causation jury instruction request because
evidence existed that a malfunctioning traffic control device clearly caused
the accident and Mole=s conduct was clearly
insufficient to cause the accident.  See
Tex. Penal Code Ann. ' 6.04.  Mole attempts to piece together eyewitness
Castillo=s
affidavit statement that the light was turning red and eyewitness Raine=s
affidavit statement that Mole Aappeared
to run a red light@ with (1) Jentgen=s
testimony that she had a solid green left turn arrow to turn onto Hebron from
Marsh and (2) Brighton=s testimony that Jentgen could
not have had a green arrow at the same time that Mole=s light
was Ayellow
turning to red@ as some evidence that the
lights were malfunctioning.  Brighton
testified that any malfunction of the lights would cause all lights to flash to
red in all directions at the intersection; Brighton also testified that it is
impossible for traffic on Hebron to have a green light while traffic on Marsh
also has a left turn green arrow. 
Additionally, Castillo testified at trial that Mole ran a red light, and
Raine clarified at trial that Mole=s light
was red when he saw the two vehicles colliding. 
And as we have explained previously, there is no evidence that Mole did
not run the red light.  See Tex.
Penal Code Ann. ' 6.04.  Therefore, because there is no evidence that
a concurrent causeCa malfunctioning stop lightCwas
sufficient to cause the accident and there was no evidence that Mole=s
conduct was clearly insufficient to cause the accident, we hold that the trial
court did not err by refusing to submit to the jury Mole=s
requested concurrent causation instruction. 
See id.; Abdnor, 871 S.W.2d at 731; Hutcheson, 899
S.W.2d at 42.  Accordingly, we overrule
Mole=s fourth
point.

V.  Conclusion

Having overruled Mole=s nine
points, we affirm the trial court=s
judgment.

 

 

SUE
WALKER

JUSTICE

 

PANEL: CAYCE, C.J.;
LIVINGSTON and WALKER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: April 23, 2009

 











[1]See Tex. R. App. P. 47.4.





[2]Because Van Dyk was no
longer a state trooper at the time of trial, we do not refer to him by this
title.





[3]See Tex. Penal Code Ann. ' 49.01(2)(B) (Vernon
2006) (defining intoxication as having an alcohol concentration of 0.08 or
more).





[4]The trial court noted
that any issue with double hearsay was resolved when Officer Heinemeyer took
the stand and identified his voice on the videotape but that the underlying
hearsay issue remained regarding statements made by unknown witnesses to Officer
Heinemeyer.  See Tex. R. Evid.
801.





[5]Officer Heinemeyer
identified himself as the speaker on the videotape at trial, but his face is
not on the videotape.  





[6]Gene and Jentgen
testified that they had green left turn arrows to turn left onto Marsh, and
other testimony demonstrated that that this would have been impossible if Mole
also had a green light on Hebron. 
Testimony further showed that the light on Hebron is illuminated yellow
for four seconds before turning red and is illuminated red for two more seconds
before the light for Marsh turns green.





[7]Mole incorrectly cites
rule 612 in his brief, but this rule was renumbered to rule 613 in 1998.   Thus, we will refer to the current rule,
rule 613.





[8]Mole combines his
argument for these three points,  and
therefore, in our resolution of the constitutional issues, we will treat the
state and federal constitutions as providing the same protections.  See Heitman v. State, 815 S.W.2d 681,
690B91 n.23 (Tex. Crim. App.
1991).





[9]The State relied on a
videotape of the sobriety tests to show the sobriety testing without additional
testimony from Van Dyk.  Mole only
objected to the exclusion of hearsay audio on the videotape, not to the admission
of the videotape itself.